## J. H. HOLCOMB v. THE STATE.

### No. 4069.     Decided ·November 11, 1908.

**1.—Murder—Manslaughter—Self-Defense—Charge of Court.**

Where upon trial for murder the evidence showed an insult by the deceased to defendant's wife which had been communicated to him; that an altercation ensued between defendant and deceased, and the latter seized defendant, put him out of his house and kicked him, and then made a demonstration as if to draw a weapon, the court should have charged affirmatively on manslaughter upon the said two provocations of adequate cause, and also upon self-defense.

**2.—Same—Charge of Court—Force—Self-Defense—Residence.**

Where defendant was convicted upon a charge of murder for manslaughter, and the evidence showed that he and his family were the guests of the deceased, and defendant had done nothing up to the very moment of the difficulty, when deceased seized him, put him out of his house, and hurt defendant as he kicked him, a charge of the court that deceased had the right to put defendant out of his house and use legitimate or necessary force to do so, without stating the converse proposition that if deceased was in the wrong he was not justified to make an assault upon the defendant, the same was error as bearing erroneously on the issue of manslaughter.

**3.—Same—Charge of Court—Insult to Female Relative—Communicated Insults.**

Upon trial for murder where there was some evidence as to what deceased said to certain State's witnesses with reference to the unchastity of defendant's wife, the court's charge in limiting this testimony to the credibility of defendant's statement that he received information from his wife as to these insults, and the further instruction to the jury that defendant could not predicate the defense of manslaughter upon communicated insults was error; the evidence further showing that the insults testified to by said witnesses had not been communicated to defendant prior to the homicide, and that he was only aware of the insult communicated to him by his wife and the wife of the deceased at the time of the homicide.

Appeal from the District Court of Fannin. Tried below before the Hon. Ben H. Denton.

Appeal from a conviction of manslaughter; penalty, three years and six months in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of manslaughter, his punishment being assessed at three years and six months confinement in the penitentiary.

In substance the facts disclose that appellant and deceased lived neighbors within three or four hundred yards of each other; that their families were on very friendly and rather intimate terms, and visited each other almost daily. The day preceding the homicide at night defendant and his wife took dinner with the family of deceased, and were at the residence of the deceased on the night of the homicide in pursuance of an invitation to attend a social function at the residence of deceased, and that it was during this social gathering the homicide occurred. Prior to the homicide, for sometime, the deceased had been making remarks of a very insulting nature in regard to appellant's wife, to the effect that he had been having carnal intercourse with her. These remarks had not been brought to the attention of appellant prior to the homicide. On the night of the homicide, shortly before it occurred, the wife of the deceased called appellant off in one of the rooms of the house and informed him of the fact that there was something wrong between her husband and his, appellant's wife; that she had written evidence of that fact in the form of a note or letter written by deceased to appellant's wife, or by appellant's wife to the deceased. The record does not seem very clear which wrote the note or letter. Appellant refused to believe this, and informed the wife of the deceased that he would have to be shown evidence of this fact, and turned away and left her. After leaving the wife of deceased he went into the room north of where the dancing was in progress. The deceased came into the room where appellant was, or at least they seemed to have entered the room about the same time, the deceased having just finished dancing a set with appellant's wife in the adjoining room. Appellant's wife came to him while he was standing in the room a few feet away from the deceased and insisted on their going home. He declined, saying he was not in a hurry about it, that they would go after a while. She made a statement to appellant to the effect that deceased had insulted her. The deceased was sitting on the bed, noticing the fact that appellant and his wife were talking. Then came up a conversation between appellant and deceased. Several witnesses testified to this conversation. They did not altogether present it in the same language. We will take the following evidence as fairly illustrative of this conversation. One of the witnesses, while on the stand, after going over this matter a time or two, in examination and cross-examination, was asked by the county attorney this question: "Now, I want

to get it clear before this jury, what was the first word that was spoken by Mrs. Holcomb, the defendant or the deceased, that you heard that began this conversation? A. Well, I can commence and tell you just like I heard it and just like they spoke it. Mr. Holcomb's wife came up to him and said, let's go home, and Jim said, don't be in any hurry, it is early yet; she said something else that I can not recall right now what it was; he said, I never come here and I hain't going away and Mr. Williams (deceased) said to him, Jim, you are welcome here. Jim said, I know it, if I had not known it, I would not have been here, and then something else was said; his wife said something else to him, and he made this remark, that he never come here and was not going away, the second time, and Ben said to him, Jim, you hain't going to start anything here, and Jim said, no, I don't know that I am, I could if I wanted to, and Williams (deceased) looked up at him and got up and started over to him, and said, I will show you what you can do and took hold of him (appellant) and put him out of the house." Some of this conversation between appellant, who was called Jim, and his wife is not narrated by this witness, but was brought out by the defendant. It shows his (appellant's) wife, at the time deceased interfered with their conversation, or rather began his conversation with appellant, had just told her husband of the insult by deceased to her. The deceased put appellant out of the house, kicking him, perhaps, as many as three times as he put him out. The evidence seems to indicate that appellant did not resist. Upon reaching the door, deceased shoved appellant out and kicked him again, whereupon appellant fired at deceased, which resulted fatally. There were two shots fired, the second shot striking deceased in the right shoulder. There are quite a number of facts and circumstances in the case which show there had never been any previous difficulty between the parties, but on the contrary the families had been on very intimate terms, which we deem unnecessary now to recapitulate. Appellant's testimony goes further, in regard to the transaction occurring at the door at the time the shot was fired, and is to the effect that when deceased pushed him out of the door and kicked him, he (deceased) threw his right hand to his side as if to get a pistol, stating that he intended to kill him, and that it was then he (appellant) fired the shot at deceased. Appellant testified that he had the utmost confidence in his wife and in her loyalty to him as well as in her chastity, and that the communication from Mrs. Williams, wife of deceased, worried him, and while thinking over this his wife came to him in a few moments with the statement that deceased had just insulted her with language which we deem unnecessary here to state.

The evidence, as we understand it, presents manslaughter from two standpoints and self-defense. If appellant's mind was agitated so that it was incapable of cool reflection on account of the insulting

language, conduct, etc., that had just been communicated to him
by Mrs. Williams and his wife, and this was the cause of the killing,
it would be manslaughter, or if under the circumstances, the seizure
of appellant by deceased and putting him out of his house and
inflicting the kicks upon him infuriated his mind beyond cool reflec-
tion, and the killing occurred, it would . be manslaughter.    If in
addition to the ejection from the house, accompanied with the kicks
and followed by a demonstration or movement to draw a pistol
appellant fired, it would be self-defense.    The two issues in regard
to manslaughter should have been affirmatively presented to the jury.
The court instructed the jury that an assault and battery causing
pain or insulting words, etc., would constitute manslaughter, with
the other elements being present.    The charge then is fairly full
in regard to insulting conduct, and the court, in further charging
on the question of manslaughter, said that any other and all other
circumstances, etc., might be taken into consideration in arriving at
the condition of defendant's mind, in connection with all the facts
and circumstances, etc.    We think upon another trial the court
should affirmatively present these matters to the jury to the effect
that they may understand that either provocation was sufficient to
reduce to manslaughter, the sudden passion being present in appellant's
mind.

The court charged the jury as follows:    "You are further in-
structed that the deceased would have the right to put the defendant
out of his (deceased) house, but he would have the right to use only
such force and no more as was reasonably necessary in doing so,
and in this connection you are instructed that if the deceased used
more force than was reasonably necessary in putting the defendant
out of the house, if he did put him out, then the defendant would
have the right to defend himself and to use whatever force was
necessary to prevent such ejection."    The testimony, if any there
be, that a condition had arisen that justified deceased in putting
appellant out of his house, was very slender.    We have stated prac-
tically the matter as it arose, and the provocation, if any there was,
arousing the deceased's anger and upon which he acted in ejecting
appellant.    Appellant and appellant's wife were invited guests of
deceased and his wife to enjoy the festivity of the evening and the
little dance.    Appellant himself did not dance, but his wife did,
and she had danced that evening in one or two sets with deceased,
and had just finished dancing a set with deceased only a moment or
two before the fatal transaction.    On this close line of testimony it
may be doubted whether appellant had done anything which justified
or authorized deceased in becoming angry and ejecting appellant from
the house, yet the court informs the jury that deceased had the
right to put appellant out of his house, and could use legitimate
or necessary force to do so.    If appellant had done nothing that
would authorize or justify the deceased in making the attack upon

him and ejecting 'him from the house, then deceased would not be justified in his course of conduct, but the court instructs the jury that deceased had the right, and, of course, this means the legal right. This is predicated upon the fact that appellant was doing something that authorized the deceased to demand and require that he vacate his (deceased) residence. Now, this is assuming a fact against appellant and basing a charge upon it detrimental to him before the jury, and this is emphasized, especially we think, in this case, by reason of the fact that it is exceedingly doubtful if appellant had done anything which justified deceased in his attack upon him. As the court has seen proper to submit this issue to the jury, then he should have gone further and submitted the law of the case where deceased was in the wrong in regard to the matter, on the theory if they should find appellant had not done anything justifying such assault and ejection. Appellant certainly was not an intruder. He was the guest of the deceased, and had done nothing up to the very moment of the difficulty, and not even then unless it be the statement to his wife that he did not come there and he was not *going* away. Deceased had not requested appellant to leave, but said to him you must not raise any trouble here, and then immediately got up, making a remark indicating his purpose to do so, and ejected appellant violently from the house. Appellant seems not to have resisted. We think upon another trial, if this phase of the case is given in charge to the jury, then appellant's side of it as made by the facts should also be submitted. Exception was reserved to the charge we have been discussing as being erroneous, and we are of opinion, under the facts, that it was, and hurtful. If deceased had the right to put appellant out of the house and use more force than was necessary, and hurt him as appellant says by kicking him in the stomach and knocking the breath out of him, this bore sharply, under this particular charge, on the issue of manslaughter, and the assumption on the part of the court that deceased had the right to eject appellant may, to some extent, account for the fact that the punishment is a year and a half in excess of the minimum punishment for manslaughter.

Another charge was given to which exception was reserved, which is as follows: "If you believe there is any testimony before you as to any declarations, statements or insinuations about the infidelity or unchastity of the defendant's wife, by the witnesses John Littrell, Tom Berryhill, R. J. Harroll, J. N. McFarland and Chris Roberts, as to what the deceased said to them or either of them and the same was not communicated to the defendant, then if you so believe, I instruct you that the only purpose for which such testimony was allowed to go before you, was to show the credibility of the statement of the defendant, and to indicate the probable truth of the defendant's statement, wherein he says that his wife informed him that she had been insulted by the deceased, and you are further

instructed that the defendant can not predicate a defense of manslaughter upon communicated insults." We are of opinion this charge was erroneous, first, in limiting the purpose of this testimony as was done; and, second, that it deprived appellant of his defense or sought to do so of manslaughter on "communicated insults." The court in the latter clause expressly instructed the jury that defendant could not predicate a defense of manslaughter upon communicated insults. The insults testified by these witnesses had not been communicated to appellant prior to the homicide. He knew nothing of them; had never heard of them. The only communicated insult of which appellant was aware at the time of the homicide was conveyed to his mind a few moments before the killing; first, by the wife of deceased; and, second, by his own wife. If appellant had any reason to be enraged on account of deceased's conduct towards and about his wife, it was upon communicated insults as above stated, first, by Mrs. Williams, wife of deceased; and, second, by his own wife. Motive could not be imputed to appellant on account of facts of which he was ignorant. The communication from his wife occurred at the very inception of the difficulty that terminated fatally; that with Mrs. Williams only a few moments before. Now, the court instructs the jury that appellant can not defend for manslaughter on the ground of communicated insults; on the contrary, the statute expressly provides that he can kill under those circumstances and be guilty of no higher offense than manslaughter. Where insulting conduct is relied upon by the accused, the evidence must show that the killing happened immediately upon giving the insults, or as soon as the accused meets with the slain party after he is informed of the conduct of the deceased. In the first instance, he may have heard the insulting words or witnessed the insulting conduct; in the second, which provides for the killing upon the first meeting, it would necessarily be on communicated insults. There is no contention in the case that the remarks made by deceased to Littrell and others were ever communicated to appellant until after the death of deceased. This charge is erroneous, first, in limiting the purpose of the testimony, as was done, and, second, in informing the jury that appellant could not rely upon communicated insults.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*